368-07/GMV/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 0335)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK





| | |
|---|---|
| STAR LEGEND S.A., | 07 Civ. 6832 (SAS) |
| Plaintiff, | |
| - versus - | **FIRST AMENDED**<br>**VERIFIED COMPLAINT** |
| INDUSTRIAL CARRIERS INC., | |
| Defendant. | |

Plaintiff STAR LEGEND S.A. (hereinafter "STAR LEGEND") for its First Amended

Verified Complaint against Defendant INDUSTRIAL CARRIERS INC. (hereinafter

"INDUSTRIAL CARRIERS"), alleges upon information and belief as follows:

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 et seq. and/or

the Federal Arbitration Act, 9 U.S.C. §1 et seq.

2.      At all times material hereto, Plaintiff STAR LEGEND was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Banco Aliado Building, 8th Floor, Beatriz M. de Cabal Street, Apartado Postal 5108, Panama 5, Republic of Panama.

3.      At all times relevant hereto, Defendant INDUSTRIAL CARRIERS was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Trust Company Complex, Ajeltake Island, Majuro, Marshall Islands, MH96960.

4.      Attached hereto and incorporated herein as **Exhibit A** is the Declaration of Marie Kelly of the law firm of Norton Rose LLP, English solicitors representing Plaintiff in connection with the prosecution of this dispute in London arbitration.  Ms. Kelly's Declaration sets forth in details the relevant facts and the quantum of Plaintiff's claim.

5.      On or about August 29, 2005, Plaintiff STAR LEGEND, as Owners of the SD GLORY, entered into a maritime contract of charter party for one time charter trip for iron ore/iron ore pellets in bulk.  (*See* **Ex. A(1)**: copy of charter party).

6.      In violation of clauses 62 and 79 of the charter party, INDUSTRIAL CARRIERS supplied bunkers to the M/V SD GLORY which did not comply with the required standards and caused damages to Owners, including but not limited to, expenses for cleaning of the tanks, loss of hire during the cleaning, loss of freight, survey and agency fees, off-hire deductions, etc.  (*See* **Ex. A at ¶¶ 4, 7**).

7.      The charter party provides for the application of English law and all disputes between the parties are to be resolved by arbitration in London; arbitration has already been commenced and STAR LEGEND specifically reserves its right to arbitrate the substantive matters at issue.  (**Ex. A at ¶5**).

8.    This action is brought to obtain jurisdiction over Defendant and to obtain security in favor of Plaintiff STAR LEGEND in respect to its claims against Defendant and in aid of London arbitration proceedings.

9.    This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

10.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

11.    Plaintiff's damages consist of the following, each of which is explained in more detail in the attached Declaration of Marie Kelly:

(a)    tank cleaning in the amount of $51,755 (**Ex. A at ¶ 10 & exhibit 2**);

(b)    loss of five days of charter hire during the cleaning in the amount of $195,958.33 (**Ex. A at ¶¶ 11-15 & exhibits 3-5**);

(c)    reduction in the quantity of cargo that could be loaded onboard resulting in a loss of freight during the next three charter parties in the amount of $20,626.50 (**Ex. A at ¶16 & exhibit 6**);

(d)    expenses incurred at Singapore for changing filters, fuel care, etc. in the amount of $5,952.01 (**Ex. A at ¶17 & exhibit 7**);

(e)    off-hire deductions of $1,855.64 (**Ex. A at ¶18 & exhibit 8**);

(f)    expenses for bunker analysis, etc. at Oslo and Lianyungang in the amount of $4,887.76 (**Ex. A at ¶19 & exhibit 9**);

(g)    survey/analysis of Bunker Claims International in the amount of $1,544.48 (**Ex. A at ¶20 & exhibit 10**); and

(g)    accrued fees and costs to date in the amount of $60,661.37 (**Ex. A at ¶21**).

12.    As detailed in the Declaration of Marie Kelly, Plaintiff estimates, as nearly as can be computed, that it will also incur further legal and arbitral expenses and costs of prosecuting the London arbitration in the amount of $85,000 due to the complexity of the issues and the conduct thus far of Defendant in those proceedings, all of which are recoverable as part of Plaintiff's claim under English law. (**Ex. A at ¶¶ 22-30**).

13.    Interest on Plaintiff's damages is estimated to be $42,424.60, which has been calculated at the rate of 6% for a period of 2 years (the estimated time for completion of the arbitration in London), compounded annually on the sum of the above claim components at paragraph 11(a) – (g).

14.    Therefore, Plaintiff seeks an attachment pursuant to Rule B in the amount of USD $470,665.69.

## Request for Rule B Relief

15.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

16.    The total amount to be attached pursuant to the calculations set forth above is $470,665.69.

WHEREFORE, Plaintiff STAR LEGEND S.A. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $470,665.69 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any judgment entered against the Defendant in the London proceedings; and

d.    For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       August 9, 2007

                                    FREEHILL HOGAN & MAHAR, LLP
                                    Attorneys for Plaintiff STAR LEGEND S.A.

                                  By: _____

                                      Gina M. Venezia (GV 1551)
                                    Pamela L. Schultz (PS 0335)
                                    80 Pine Street
                                    New York, NY 10005
                                    (212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                     ) ss.:
County of New York   )

GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing First Amended Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client including the Declaration of Marie Kelly.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
_9__ day of August 2007

_____
Notary Public

CLARE HENRY
Notary Public, State of New York
No. 01HE4631498
Qualified in Kings County
Certificate in New York County
Commission Expires October 31, 2009

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STAR LEGEND S.A.,

                Plaintiff,

  -  versus -

INDUSTRIAL CARRIERS INC.,

                Defendant.

07 Civ. 6832 (SAS)

DECLARATION OF MARIE KELLY

I, MARIE KELLY, declare as follows:

1.      I am a partner in the Athens office of the law firm of Norton Rose LLP. I am presently representing Star Legend S.A., Plaintiff herein, in London arbitration against Defendant Industrial Carriers, Inc. I submit this declaration based upon my personal knowledge, obtained during the course of my representation of Plaintiff.

2.      The dispute between the parties concerns Plaintiff's claims against Defendant for Defendant's breach of a maritime contract of charter party as more fully explained below.

3.      On or about August 29, 2005, Plaintiff as Owner of the M/V SD GLORY entered into a maritime contract of charter party with Defendant as Charterer for one time charter trip for iron ore/iron ore pellets in bulk. A true and correct copy of the charter party is attached hereto as Exhibit 1.

4.      In violation of clauses 62 and 79 of the charter party, Defendant supplied bunkers to the vessel that did not comply with the required standards and caused damages to the vessel and its Owner, Plaintiff herein.

ATH-#2166889-v2

5.    The charter party provided for the application of English law and all disputes between the parties are to be resolved by arbitration in London, where the disputes between the parties are ongoing. Plaintiff specifically reserves its right to arbitrate the substantive matters at issue.

6.    In order to obtain security in favor of Plaintiff with respect to its claims against Defendant and in aid of the London arbitration proceedings, as well as to obtain security for additional sums to cover anticipated attorney fees and costs in the arbitration and interest, all of which are recoverable under English law, on July 30, 2007, Plaintiff sought an attachment in the amount of $454,339.31 before the United States District Court for the Southern District of New York.

7.    As alleged in Plaintiff's Complaint, Plaintiff's claim as to costs, losses and expenses already incurred was comprised as follows:  (a) tank cleaning in the amount of $51,755; (b) loss of five days of charter hire during the cleaning in the amount of $195,958.33; (c) reduction in the quantity of cargo that could be loaded onboard resulting in a loss of freight during the next three charter parties in the amount of $20,626.50; (d) expenses incurred at Singapore for changing filters, fuel care, etc. in the amount of $5,952.01; (e) off-hire deductions in the amount of $1,855.64; (f) expenses for bunker analysis, etc. at Oslo and Lianyungang in the amount of $4,887.76; (g) survey/analysis of Bunker Claims International in the amount of $1,544.48 and (h) accrued fees and costs to date in the amount of $51,015.35.

8.    Plaintiff also estimated that it would incur further legal expenses and costs of prosecuting the London arbitration in the amount of $85,000 due to the complexity of the issues

ATH-#2166869-v2

2

and interest on its damages in the amount of $35,744.24 (calculated at the rate of 6% for a period

of 2 years, the estimated time for completion of the arbitration in London).

9.      I understand that Judge Scheindlin requested further explanation and clarification

as to the amount of and basis for the claim, which I provide below.

10.     *Item 6(a) – Tank Cleaning ($51,755.00)*:  As a result of Defendant's loading of

off spec bunkers and refusal to clean the tanks, Plaintiff engaged Cosco (Nanton) Shipyard Co.,

Ltd. ("Cosco") to clean the tanks.  The total cost to clean the tanks was $51,755.  A true and

correct copy of the invoice for the tank cleaning is attached hereto as Exhibit 2.

11.     *Item 6(b) – Loss of Hiring During Cleaning ($195,958.33)*:  This component of

Plaintiff's claim is based upon the fact that Plaintiff was unable to use the vessel in charter

employment during the time involved in having the tanks cleaned in early 2007.

12.     Despite Plaintiff's numerous requests that Defendant to take responsibility for the

off spec bunkers and clean the tanks, Defendant refused to cooperate, and in an effort to mitigate

losses, Plaintiff waited until the next scheduled drydock of the vessel to undergo the tank

cleaning.    Cosco estimated that cleaning the tanks would take five additional days over its

original estimate for the completion of other repairs and maintenance during the scheduled

drydock.  A true and correct copy of Cosco's correspondence setting this forth is attached hereto

as Exhibit 3.

13.     The report of the Superintendent Engineer who attended the drydock on behalf of

Plaintiff confirmed the cleaning of the tanks could not be carried out concurrently with other

ATH-#2166889-v2

3

work, such as hot work, staging and sandblasting.  A true and correct copy of the report is attached as Exhibit 4.

14.     Although the charter party between Plaintiff and Defendant was entered into in August 2005 and charter hire at that time was only $17,220 per day, charter rates have increased significantly since that time.  Thus, the market rates at the time of the cleaning were higher than the rates in 2005.  By way of example, after the drydocking was completed, the vessel was chartered at a rate of $40,000 per day.  A true and correct copy of that charter party is attached hereto as Exhibit 5.

15.     Under English law, damages are to compensate the injured party for the actual loss sustained.  *Golden Strait Corporation v. Nippon Ysen Kubishika Jaiska* [2007], 3 All E.R. 1. (House of Lords).  Where a post-breach event (in this case, the actual cost of the vessel being off-hire during the cleaning) has affected the loss suffered, the amount of the damage sustained is assessed at the time of the actual loss and not at the time of the contract breach.    Accordingly, under English law, damages for the loss of hire during the cleaning would be assessed by using the charter rate the vessel would have been earning had the cleaning of the tanks not been required -- $40,000 per day.

16.     *Item 6(c) – Loss of Freight* ($20,626.50):  The off spec bunkers supplied by Charterer needed to be gradually blended with on-spec bunkers, and therefore, the quantity of cargo that could be loaded on the next three voyages was reduced by the quantity of off spec bunkers remaining in tank No. 4, resulting in a total loss of freight of $20,626.50.  The total freight lost on these 3 voyages was $20,626.50.  Attached hereto as Exhibit 6 are excerpts from

ATH-#2166889-v2

4

the three charters at issue showing the freight rate, quantity of cargo to be loaded, and quantity of cargo actually loaded.

17.    *Item 6(d) – Expenses Incurred at Singapore ($5,952.01)*:   This component referred to expenses incurred at Singapore for changing filters, fuel care, etc. in the amount of $5,952.01. A true and correct copy of the invoices for those items is attached hereto as Exhibit 7.

18.    *Item 6(e) – Off-hire Deductions ($1,855.64)*:  This component referred to off-hire that Defendant wrongfully deducted to replace clogged fuel valves on October 22, 2005.  A true and correct copy of the hire statement submitted by Defendant is attached hereto as Exhibit 8.

19.    *Item 6(f) – Analysis Fees ($4,887.76)*:   This component relates to the costs incurred by Plaintiff for the analyses of the bunkers conducted at Oslo and Lianyungang. A true and correct copy of the invoices for those items is attached hereto as Exhibit 9.

20.    *Item 6(g) – Survey/Analysis Fees ($1,544.48)*:   This component relates to the survey and analysis conducted by Bunker Claims International in the amount of £784, approximately $1,544.48. A true and correct copy of the invoice is attached hereto as Exhibit 10.

21.    *Item 6(h) – Accrued Fees and Costs ($51,015.35)*:  This component relates to the accrued costs and fees of $51,015.35, which was the estimated amount of accrued fees at the time of the filing of the Verified Complaint. The costs incurred to date now total €40,500 for the fees of Solicitors Norton Rose and €3,443 for other counsel fees for preparing an opinion on the merits of the claim and arbitrator's fees.  Thus, the actual costs incurred to date now total €43,943.00. Using the current exchange rate, this equals USD 60,661.37.

ATH-#2166889-v2

5

22.  *Estimated Future Fees/Costs ($85,000):* We have also estimated that the legal expenses and costs in moving forward will be at least $85,000.00. This estimate is based upon the following.

23.  At the present time, some documents have been exchanged between the parties, but the disclosure stage of the arbitration has not yet been completed because Defendant has failed to provide further disclosure as ordered by the tribunal.  Thus, we anticipate additional costs will be incurred in completing the disclosure stage.

24.  Further, Defendant resists responding in the arbitration in many ways, such as providing documents and agreeing to simple scheduling matters.  Throughout the arbitration, Plaintiff had also been required to ask the tribunal for orders on many aspects of the arbitration, thereby increasing costs to Plaintiff.  For example, Plaintiff recently had to apply for an order declaring Defendant in breach of the tribunal's order requiring Defendant disclose certain information.

25.  Once the disclosure stage is completed, the parties will exchange witness statements and expert reports. The expert reports will likely address the need for the cleaning of the bunker tanks, the amount of sediment produced by the off spec bunkers and the time needed to clean the tanks. Additionally, although Plaintiff would have preferred that the case be dealt with on documents only, given the lack of cooperation from Defendants, it is likely that the parties will not be able to agree to submit the disputes to the tribunal on documents only and there will be hearings held at which live testimony will have to be offered.  Preparation of the

witness statements and expert reports will likely cost approximately $20,000 and preparation for the hearing and the six sets of copies required by the tribunal will likely total another $15,000.

26.    At present, there are only two arbitrators, but if a formal hearing is held, as Plaintiff believes is likely, a third arbitrator will be appointed. Arbitrator's fees are likely to total approximately £12,000 ($24,374 at the 1 August 2007 exchange rate). The arbitration venue will cost approximately £1,000 per day (approximately $2,000).

27.    The fees for preparation of the brief for the hearing, lasting at least one day, will total approximately £3,000 (approximately $6,000) and legal fees to attend the hearing and a conference with counsel prior to the hearing will total approximately €10,000 (approximately $13,700).

28.    Given Defendant's indications that it will defend the claims on the basis that the bunkers were not off spec in the face of overwhelming evidence to the contrary, the matter may last two days, and Plaintiff will likely have to present its expert, thereby further increasing costs.

29.    The estimated additional costs, fees and disbursements which have yet to be incurred by Plaintiff are expected to be at least $81,074.00. Attached hereto as Exhibit 11 is a chart summarizing the estimated future costs as detailed above.

30.    Costs of this level are not unusual for arbitration in London. The costs incurred to date would have been somewhat lower if the Defendant had responded without the necessity of orders from the tribunal in relation to a number of issues. For the future costs could be somewhat reduced if the Defendant were to concede liability for the off spec bunkers, leaving the

issue of quantum to be resolved by the tribunal to decide on documents.  However, based on the position of Defendant thus far, this seems unlikely.

I declare under the penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:   9 August 2007

Marie Kelly

# EXHIBIT "1"

Print Copy for : HATJIMICHALIS GIANNIS
_____

SENT OK Inc.MSG.: 898401        Date: Wed 25/Apr/2007 16:44
From: <Carriers Chartering <capespmx@carriers.gr>>
Subject: LgINT Message (REF:0762B8600)
TO : <infgusc@goldenunion.gr>


TELiX MSG: 62B86-00 25/04/07 16:32

RE: M/V SD GLORY ▓▓▓▓▓▓
========================= C/P DATED 25/4/07

FUXTURE RECAP
=============

- VSL'S DESCRIPTION

MV SD GLORY
-------------
''ALL DETAILS ABOUT''

NAME            : SD GLORY EX GLORY CAPE
TYPE            : GEARLESS S/D S/T BULK CARRIER
BUILT           : 1987, APRIL
FLAG            : GREEK
SUMMER DWT      : 68,634 MT ON 13.202 M
LOA/BEAM        : 225.00 M / 32.20 M
GRT/NRT         : 35,954 / 21,592
GRAIN CAPACITY  : 2,690,008 CBFT

BREAKDOWN PER HOLD IN CUBIC FEET:
HOLD NO.1   323,596
HOLD NO.2   395,291
HOLD NO.3   394,383
HOLD NO.4   396,057
HOLD NO.5   400,542
HOLD NO.6   398,981
HOLD NO.7   381,158
--------------------
    TOTAL  2,690,008

HATCH SIZES NO. 1  : 12.48 M X 10.92 M
            NOS. 2-7 : 16.38 M X 14.04 M

AUSTRALIAN HOLD LADDERS : FITTED
TPC: 64.56 MT

NO ALTERNATIVE HOLD LOADING.

SPEED AND CONSUMPTION IN GOOD WEATHER AND SMOOTH SEA UP TO AND
INCLUDING BEAUFORT SCALE FORCE 4/DOUGLAS SEA STATE 3 - NO ADVERSE
CURRENTS - NO NEGATIVE INFLUENCE OF SWELL

BALLAST CONDITION ABT 13.00 K ON ABT 26.00 MT IFO (180 CST) + ABT
2.0 MT MDO
LADEN CONDITION ABT 12.50 K ON ABT 27 MT IFO (180 CST) + ABT
2.0 MT MDO
PORT CONSUMPTION ABT 2.5 MT MDO DAILY

BUNKERS SPECIFICATION : ISO 8217/2005 - FOR IFO : RME 180 WITH

MAX VISCOCITY 180 CST AT 50 DEGREES CELCIUS / FOR MDO : DMB
MINIMUM SPECIFIC ENERGY 40 MJ/KG - CCAI MAX VALUE 850

WHEN THE VESSEL IS IN BALLAST CONDITION AND ONLY FOR BALLAST EXCHANGE
VESSEL CONSUMES ABT 6 MT MDO ACCORDING TO NEW REGULATIONS.

VSL BURNS DISTILLATED MDO WHEN MANOUVERING IN/OUT
PORTS/CANALS/RIVERS/STRAITS/SHALLOW WATERS OR WHEN NAVIGATES IN
RESTRICTED WATERS WITH OR WITHOUT PILOT TO MASTER'S DISCRETION

CHRTRS' QNAIRE :

1)  OWNERS/DIS OWNERS FULL STYLE: SEA MASTER LEGEND S.A., PANAMA

2)  MANAGER'S FULL STYLE:
    WORLD MANAGEMENT INC
    65-67 DRAGATSANIOU STR
    PIRAEUS 185 45
    PHONE: +30 210 406 1198
    FAX: +30 210 406 1098
    TLX: +60 211163
    E-MAIL: WM?WORLDMANAGEMENT.GR

3)  VSL'S PNI CLUB: THE LONDON STEAMSHIP

4)  VSL'S HNM VALUE:
    TOTAL INSURED VALUE - US ? 18.500.000

5)  VSL'S FO/DO/FW TANK CAPACITIES:
    100% FULL IFO 2900 M/T
    D.O. 260 M/T
    F.W. 400 M/T

6)  VSL'S ITINERARY AND LAST 3 CARGOES:
    ITINENARY - VSL IS PRESENTLY AT NANTONG SHIPYARD FOR
    S/SURVEY - D/DOCK ETS AROUND 3-5TH MAY 2007 AGW/WP/UCAE
    LAST THREE CARGOES FROM LAST: SOYA BEANS - SOYA BEANS - CLINKER

7)  VSL'S CLASS. OWNERS CONFIRM VSL FULLY CLASSED AND WILL
    REMAIN SO CLASSED DURING THE PERIOD OF CHARTER. - CONFIRM -
    N.K.K

8)  VSL STRENGTHENED FOR HEAVY CARGO AND CLASSED FOR ALTERNATE HOLD
    LOADING: NO

9)  VSL'S CONSTANT AND TPC/TPI: 400 M/T / 64.56 M/T / 163.9 M/T

10) VSL'S DWAT AND TPC ON 11.8M/12/12.5M SSW:
    11.8 - 59646 M/T - 63.53 M/T
    12.0 - 60920 M/T - 63.68 M/T
    12.5 - 64115 M/T - 64.07 M/T

11) VSL'S WLTHC IN LIGHT/HEAVY BALLAST CONDITION OR
    VSL'S WLTHC IN BALLASTED/FULLY LADEN CONDITION:
    LIGHT BALLAST 14.56 M / HEAVY BALLAST 13.00 M
    BALLASTED 13.0 M - LADEN 7.5 MTR

12) NATIONALITY OF OFFICERS AND CREW:
    GREEK - PHILIPPINO - PHILIPPINO

13) VSL'S HATCH SIZE:
    NO 1/12.48 X 10.92 - 2/7 - 16.38 X 14.04 M

14) VSL'S GRAIN CAPACITY B/D BY HOLD:
    NO 1 - 323596 C/F
    NO 2 - 395291 C/F
    NO 3 - 394383 C/F
    NO 4 - 396057 C/F
    NO 5 - 400546 C/F
    NO 6 - 399091 C/F
    NO 7 - 391158 C/F
    TOTAL 2690008 C/F

15) VSL SUITABLE FOR GRAB DISCHARGE: YES

16) VSL'S DEBALLASTING TIME: ABOUT 22 HRS

17) VSL'S GRT/NRT: 35954 / 21591

18) VSL'S MAX/ALTERNATE SPEED/CONS: AS GIVEN

19) VSL'S INMARSAT/TLX NO.:
    PHONE: 764053576
    FAX: 764053578
    PHONE: 600423989
    FAX: 600423983
    TLX: 423958110
    E-MAIL: SDGLORY?HERMES.OTESAT-MARITEL.NET

20) OWNS CONFIRM VSL CAN MAINTAIN MAX 13M WLTHC THOROUGHT LOADING
    BASIS ONE LOADING ARM - CONFIRM

21) OWNERS CONFIRM THAT IF LOADING MADRAS VSL'S ARRIVAL DRAFT AT
    LOAD PORT WILL BE MIN 19FT FORE AND 24FT AFT - N/A

22) PLEASE CONFIRM OWNERS' HAVE A VALID SMC/DOC/ISSC :
    PLEASE FAX COPIES OF SAME. - CONFIRM - ATTACHED HEREWITH

23) PLEASE ADVISE CSO AND SSO DETAILS :
    CSO: MANOLIS KALIKIS PHONE: +30 210 406 1198
    SSO: CAPTAIN TSIVIKAS STYLIANOS PHONE: 764053576

24) PLEASE ADVISE HEAD-OWNER'S FULL STYLE AND ADDRESS :
    STAR LEGEND S.A., PANAMA

24) PLEASE ADVISE LAST 10 PORTS OF CALL :
    NANTONG - XINSHA - KALANNA - YOSU - DALIAN -
    CUSTABAL/BALLOA - NEW ORLEANS - GIBRALTAR -
    CARTAGENA - SUEZ/PORTSAID.

- ACCT ████████████████████.

- DLVRY DLOSP NANTONG, ATDNSHINC

- LAYCAN 2/12 MAY - 00:01/24:00 HRS

- FOR 1 TCT WITH 1 LADEN LEG ONLY VIA NOPAC EXCL STATE OF CALIFORNIA
  PORTS TO BIN QASIM WITH GRAIN/GRAIN PRODS IN BULK ONLY EXCL ANY
  GRAIN/GRAIN PRODS THAT FALL UNDER APPENDIX B OF IMO BC CODE - ALL
  OTHER CGOES EXCLUDED.
  TRADING AA AWIWL VIA SP/S SB/S SA/S
  VSL NOT TO BE LOADED EARLIER THAN 15 DAYS AFTER SAILING FM NANTONG.

- REDEL DLOSP SP/PASSING ADEN/PMO/COLOMBO RNGE ATDNSHINC

- HIRE: USD 40,000 DLY INCLOT. HIRE TO BE PAID EV 15 DYS IN ADV TO :

THE ROYAL BANK OF SCOTLAND PLC
61 AKTI MIAOULI
PIRAEUS - GREECE
SWIFT: RBOSGRAA
CORRESPONDING BANK:
DEUTSCHE BANK TRUST COMPANY AMERICAS
NEW YORK - SWIFT: BKTRUS33

FOR CREDIT OF THE ACCOUNT:

5555-503614-100
IBAN: GR57 0640 0010 0055 5550 3614 100 OF:
SEA MASTER LEGEND S.A.

- ILOHC USD 5,000 L/SUM.

- VICTUALLING/ENTERTAINMENT/COMMUNICATIONS USD 1250 PER MONTH OR PRO
  RATA.

- BUNKERS ON DELY AS ON BOARD SUFFICIENT TO REACH VANCOUVER WITH
  SAFETY MARGIN CHARTERES TO HAVE THE RIGHT TO BUNKER THE VESSEL UPTO
  HER FULL CAPACITY PRIOR TO DELIVERY PROVIDED SAME DOES NOT
  INTERFERE WITH VSL'S OPERATIONS AND OWS HV THE SAME RIGHT PRIOR
  REDELIVERY.
  BUNKERS ON REDLY ABT SAME AS ACTUALLY ON DELY
  SAME PRICES BOTH ENDS USD 380 PMT IFO AND USD 660 PMT MDO
  CHRTRS TO PAY VALUE OF BUNKERS ON DELY TOGETHER WITH 1ST HIRE
  PAYMENT. CHRTRS HAVE RIGHT TO DEDUCT VALUE OF ESTIMATED BUNKERS ON
  REDLY FMR LAST SUFFICIENT HIRE PAYMENT(S).

- 6.25 TTL COMM

- OWISE AS PER M/V CIC ██████████ C/P DD 1/3/07 WITH LOGICAL
  AMMENDMENTS AS PER MAIN TERSM AGREED ABOVE AND FOLL AGREED
  ALTERATIONS :

- LN 15 : DEL ALL REF TO OPTION TO BREAK IWL
- CL 31 : INSERT AFT WORDING RE CHRTRS OPTION TO BUNKER PRIOR DELY
         FOLL : 'OWNERS ALSO TO HAVE THE RIGHT TO BUNKER THE VESSEL
                PRIOR TO REDELIVERY PROVIDED SAME DOES NOT
                INTERFERE WITH CHARTERERS' OPERATIONS.'
- CL 53 : DEL CARGO EXCLS CLAUSE AND INSERT WORDING RE GRAINS ONLY AS
         PER MAIN TERMS AGREED
- CL 79 : TRADING EXCLS CLS - AFT 'ORINOCCO' DEL 'ALLOWED.....ONLY'
                            AFT 'SRI LANKA' DEL 'ALLOWED....APPROVAL'
- CL 89/93/94/95 : DELETE IN FULL (PERIOD CLAUSES)

END

MANY TKS FOR FIXTURE

RGDS/AK

# EXHIBIT "2"



# 南通中远船务工程有限公司
## COSCO (NANTONG ) SHIPYARD CO., LTD.

### "辉煌07"轮　结　帐　单
WORK-DONE INVOICE OF M/V"SD GLORY-07"

Ref. No.: N07019004B21(07X004B21)

| Item Code | | DESCRIPTION OF JOB | Unit | Unit Price | Units | Price |
|---|---|---|---|---|---|---|
| Y/C | S/C | **Engine & Ele Department** | | | | **Total** |
| | | | | | | 51,755 |
| Addl | | DB FO Tank cleaning: | | | | |
| | | No.3 DB:1311MT | | | | |
| | | No.4 DB: 786MT | | | | |
| | | Oil sludge removal and treatment:65 tons | ton | 250 | 65 | 16,250 |
| | | Tank cleaning | cu. m | 15 | 2097 | 31,455 |
| | | Staging | cu. m | 550 | 3 | 1,650 |
| | | Ventilation and lighting | tank | 550 | 2 | 1,100 |
| | | Gas free inspection | tank | 650 | 2 | 1,300 |
| | | | | | | |
| | | **THE END** | | | | |

# EXHIBIT "3"



## COSCO（NANTONG）SHIPYARD CO., LTD

| To: | World management Inc | From: | Commercial Dept. |
|---|---|---|---|
| Attn: | Mr Dimitrios A. Kostalas（Superint. Engineer） | Pages: | 1 |
| Fax: | 0030 210 4061166 | Date: | 16th/Apr/2007 |
| cc: | | | |

Subject:M.V. SD GLORY –Repairs

Dear Sir,

Kindly be informed that due to the cleaning of DB FO Tanks No.3 and No.4, the repair works I.W.O. No.3,No.4,No.5 and No.6 cargo holds will stop till these two DB tanks gas-freed.

As there are no repairs in DB FO Tanks and the cleaning will be done at the owner request and for owner reasons only, so we will not accept any responsibility for delays incurred.

The time required for cleaning these two tank is estimated to be about five(5) days.

Due to the above the originally estimated time of completion for the repairs can not be met and the penalty clause does not apply.

Sincerely yours

Add.:No.1 Zhongyuan road, Nantong,Jiangsu,226005 China
Tel: 0086-513-85056200,83514351 Fax:0086-513-83529283
Website:www.cosco-shipyard.com
E-mail: chaobin@cosco-shipyard.com

1

# EXHIBIT "4"

## _MV SD  GLORY_

Attendance at Nantong –China
23 March  – 5 May 2007

15/05/07

## MV SD GLORY

Vessel was attended at Cosco Nantong Shipyard – China where she underwent repairs towards crediting Special Survey No4 and Dry Docking.
During vessel's stay at the yard all the operational problems in engine room and deck were solved and the vessel's condition was upgraded in all respects.
Detailed description of the repair s and upgrading works follows.

During vessel's stay at the yard the following surveys were carried out and credited:
Renewal Class Hull Survey
Docking / Screw Shaft Withdrawal
Aux. Boiler / Exhaust Gas Economiser
Load Line Inspection
Safety Construction Renewal
Safety Radio Renewal
Safety Equipment Renewal
IOPP Renewal
IAPP Renewal
Sewage Pollution Prevention Cert.
Carriage of Dangerous Goods Cert Renewal
Completion of Continuous Machinery Items Cycle

The vessel's class notation has changed and the vessel <u>CAN NOT</u> be loaded alternatively (ie 2-4-6 cargo holds can not be empty). Only homogeneous loading is permited.

## *VESSEL'S CONDITION*

### EXTERNAL HULL

TOP SIDE: In good structural condition. The coating was found in fair condition with scattered scale all over the area. The plating was treated with sand-blasting and coated with epoxy paint.

BOOTOPING/ VERT. BOTTOM: The plating was found in sound structural condition with minor intents due to contact with port fenders. The coating was found in poor condition. The plating was treated with sand-blasting and was coated with epoxy paint.

BOTTOM AREA: It was found in sound structural condition. The coating was found in good condition. The bottom was coated with environmentally friendly paints.

RUDDER HORN: The rudder horn was found cracked on port and starboard side near the aft edge of the curved plating on the welding seam that is connecting the rudder horn to the stern frame. The cracks were v-out and re-welded to class satisfaction.

Rudder Bush: The lower rudder bush was renewed due to excessive clearances.

### DECK

MAIN DECK: The deck plating was found in sound structural and fair coating condition. The deck plating is pitted to a degree that does not affect its structural integrity but it makes it difficult, if not impossible, for the crew to maintain and protect it effectively. The entire deck area was treated by sand blasting and coated with epoxy paint. The deck plating was inserted in various places due to cracking.

CROSS DECKS: The plating was partially renewed as it was found excessively worn out and locally holed. The old plating was treated with sand-blasting and coated with epoxy paint.

FORE: In good structural condition. Its coating was upgraded.

AFT DECK: In sound structural and poor coating condition. Its coating will be upgraded by the crew.

### LOAD LINE ITEMS

HATCH ENTRANCES / COVERS: All small hatches were found in good condition. Minor repairs two rubber channels were carried out by the riding fitters and crew. All sealing rubbers were renewed by the crew.

HATCH COVERS: Hatch covers are side rolling type. The hatch covers top plating was found locally heavily pitted. Small inserts were fitted and small holes were built-up by welding as necessary. This time the hatch covers under-deck was sand blasted to SA2 standard and re-coated. Their water tightness was tested and confirmed. The mid-seam rubber packing was renewed.

HATCH COAMINGS: They were found in good structural condition. All hatch coamings together with the hatch covers side plating was sand-blasted to SA2 standard and coated with epoxy paint. Their structural condition is sound. Steel renewals two of the coamings top plate were carried out as they were found excessively worn -out and locally wasted at the area where the hatch cover edge lands on the coaming top plate.

TANK VENTILATORS: In good condition. All air vent heads were opened for

inspection by the crew and maintained / replaced as necessary..
DECK PIPING: All piping on deck is in fair condition. Various pipe sections of the
fire main line and hydraulic lines were renewed due to wastage. The cable protecting
line on deck was hand chipped and coated. About 20 meters of the pipe were patched
with fibber glass and coated. All connection boxes were opened and inspected.

## DECK MACHINERY

**Anchor Windlass:** In good operational condition. The electric breakers and relays of
the electric panels in the bossun store were renewed by the makers of the panels. These
panels had been renewed last year due to heavy weather damage the vessel had suffered
at the time and the emergency call to Cosco Nantong Shipyard for repairs. The
electrical components were renewed at maker's expense.
**Mooring Winches:** In good operational condition.
**Ballast System Modification:** The vessel was equipped with hydraulic operated valves
for ballast operation. These valves were operated locally from deck through individual
hydraulic power hand driven transmitters. Many of the transmitters were out of order
for long time and attempts to repair them were proven unsuccessful. The vessel's
ballasting and de-ballasting operations were done with the use of the emergency
hydraulic hand pump. The system was modified. The hand driven transmitters were
eliminated. The transmitters were replaced by a central hydraulic power pack and local
control valves for the valves operation. All the ballast butterfly valves in the DB Tanks
were overhauled and their actuators were transferred to the yard's workshop for
maintenance and repairs as required. The new system was tested, adjusted and it is
operating efficiently.
**Bilge Piping System:** All the non return valves in bilge wells were overhauled and
maintained as required. In addition large and small sections of bilge piping in DBTks
were renewed as they were found blocked by cement cargo.
CARGO HOLDS: All cargo holds were inspected and all frames close up surveyed.
All corrugated bulkheads two cargo holds are in good structural condition.
The tank top plating of No.2 cargo hold was completely renewed.
The lower hopper and lower stool plating in all cargo holds was partially renewed due
to mechanical damages and local wear.
In order to reduce the steel renewals on the tank top of No 1-3-5-7 cargo holds the class
notation of the vessel was changed and the alternative loading conditions were
prohibited
All cargo holds coating was upgraded with sand-blasting and coating.
Despite our efforts to speed up the repairs by reducing the steel works two tank tops,
the works in No.3, No.4 No5 and No.6 cargo holds were delayed as hot work, staging
or sandblasting could not be carried out concurrently with the cleaning of No3 and No4
FOTks, No.3 and No.4.

## WATER BALLAST TANKS

**Top Side Tanks:** All tanks were close-up surveyed. Steel renewals were carried out in
all of them The coating condition of all the TSTks was poor. Chipping grinding and
coating was carried out. The tanks were credited in Fair coating condition.
**Fore Peak / Aft Peak Tanks:** Both were close up inspected and found in good
structural condition. They were credited as being in fair coating condition.
**Double Bottom Tanks:** All the DBTks were close–up surveyed. Cracks were found in

way of internal stiffeners (bottom and side longitudinals) in DBTks No.3 and No.4 (p s) All the cracks were repaired by partial renewal of the members.

FUEL OIL TANKS CLEANING: No.3 and No.4 FOTks were cleaned this time in order the residues and sludge accumulated in them from previous bunkers which had stratified to be removed.

ACCOMMODATION SUPERSTRUCTURE: In good condition.

ACCOMMODATION SPACES: In good condition, clean and tidy. Furniture for officer and crew mess and smoking rooms were refurbished. The furniture for the mastre's and ch. egineer's office were also refurbished. The floor of the crew's mess room, officer's mess room and 3 crew cabins was covered with plastic covering.

LIFE BOATS / DAVITS: Both life boats were transferred to the workshop where the release mechanisms where overhauled and maintained. Both life boats were painted, load tested and the release mechanisms were tested for good functioning.
Life boats and davits were inspected by their manufacturers' representatives for 5-yearly inspection according to new SOLAS Requirements.

ENGINE ROOM: The overall engine room appearance was found to be average. The machinery maintenance plan was proven to be bellow company's standards and guidelines. The maintenance by crew in the last 2 years was not enough to keep the performance and integrity of the machinery to the desired level.
The No.3 D/G Engine had suffered damage to its crankshaft, bedplate, cylinder liners and pistons due to braking of the lub-oil pump's shaft while in operation.
The performance of the M/E had been recorded and auxiliary machinery was below the desired levels.
Great effort and assistance were given by the crew in order the problems to be addressed and the engine room operations and machinery integrity to be brought to the desired levels. The major repairs and maintenance works that were carried out during vessel's stay at the yard are described bellow:
Piping: All pipes in need of renewal were renewed at this time. All sea valves were inspected at this time.
Many piping sections from the cargo hold bilge system were renewed as they were found blocked from cement (cargo). Piping sections from bilge line were also renewed in the DBTks due to same reason.
The suction pipe for the Fresh Water Generator ejector pump was modified and its diameter was increased in order to fit the needs of the new pump.
Main Engine: All cylinder units were overhauled by the crew and the piston crowns and piston skirts were replaced as required.
All stuffing boxes were inspected and their scrapper rings were renewed.
The main engine air cooler was dismantled, chemically cleaned and pressure tested.
The M/E turbocharger was overhauled for normal maintenance by ABB approve workshop
Aux. Oil Fired Boiler/Exhaust Gas Boiler: They were surveyed with satisfactory results. All steam valves and safety valves were overhauled and inspected.
Boiler Burner safety devices were tested in presence of the attending surveyor.
Steering Gear: In good working order. Steering gear flat is maintained clean and tidy.

Diesel Generators: After the repair of No3 D/G and the overhauling of No.2 D/G by the crew, all three D/G engines are in good working order.

Emergency Fire Pump. In good working order. New vacuum pump has been ordered. In order problems with suction when the vessel is in light ballast condition to be avoided a non return valve was fitted on the suction pipe.

Conclusions

1   The overall ships condition is now good.
2   The appearance of vessel's hull and deck is good.
3   The TS Ballast Tanks overall condition is good.
4   All Double Bottom Ballast tanks coating condition is fair.
5   All FODBTks can now be used for bunkers storage and trim adjustment.
6   All cargo holds are in good condition and grain clean.
7   Instructions were given to the master and ch. engineer for maintenance in verbal and written form.
8   Aft tailshaft seal liner was renewed this time. The old liner is on board and can be used in case of emergency after skimming.
9   The vessel can pass DPC Inspection.

Sincerely yours

D. Kostalas
Superint. Engineer

Chris. Andreadis
Technical Manager

EXHIBIT "5"

# ORIGINAL

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921, August 6th, 1931, October 3rd, 1946

1   **This Charter Party** made and concluded in *Athens the 25th*      day of *April*     19 *2007*

2   Between *SEA MASTER LEGEND S.A., PANAMA*

3   Owners of the good *Greek flag* Steamship/Motorship *"SD GLORY" - BUILT 1983 (Full description-see clause 64)* of

4   of ~~tons gross register, and~~ ~~tons net register, having engines of~~ indicated horse power

5   ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~

6   ~~at~~ ~~of about~~ ~~cubic feet bale capacity, and about~~ ~~tons of 2240 lbs.~~

7   ~~deadweight capacity (cargo and bunkers, including fresh water and stores, not exceeding one and one-half percent of ships deadweight capacity,~~

8   ~~allowing a minimum of fifty tons) on a draft of~~ ~~feet~~ ~~inches on~~ ~~Summer freeboard, inclusive of permanent bunkers,~~

9   ~~which are of the capacity of about~~ ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10   ~~conditions about~~ ~~knots on a consumption of about~~ ~~tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11   now *trading*

12   ~~and~~ *NOBLE CHARTERING INC.* ~~Charterers of the City of~~ *B.V.I.*

13   **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14   about *one time charter trip with one laden leg only via Nopac excluding State of California ports to Bin Qasim with grain/ grain*

15   *products in bulk only excluding any grain/ grain products that fall under Appendix B of IMO BC Code. Vessel not to be loaded*

     *earlier than 15 days after sailing from Nantong. Trading always afloat, always within Instute Warranty Limits, via safe port(s),*

     *safe berth(s), safe anchorage(s)* within below mentioned trading limits.

16   Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining *at every stage during the period of hire to be* responsible for

17   the fulfillment of this Charter Party.

18   Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Nantong, any time day or night, Sundays and*

19   *Holidays included*

20   ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide) except as otherwise provided in clause No. 6), as~~

21   ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on *arrival at first loadport* her delivery to be

22   ready to receive *intended* cargo with clean-swept, *dry* holds and tight, staunch, strong and in every way fitted for the *intended* cargo service, having water ballast, ~~winches and~~

23   ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

24   ~~time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-~~

25   ~~dise, including petroleum or its products, in proper containers, excluding~~ *(See clause 59)*

26   ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27   ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28   ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29   ~~Mexico, and/or South America~~ ~~and/or Europe~~

30   ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31   ~~October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic.~~

32   *In such lawful trades but excluding (See clause 79).*

33

     as the Charterers or their Agents shall direct, on the following conditions

36   1   That the Owners shall provide and pay for all provisions, wages and consular shipping and *customs duties and similar charges on Owners' store, provisions, etc. and* discharging fees of the Crew; shall pay for the

37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with current requirements* at ports of call for and during the service

39   2   That *whilst on hire* the Charterers shall provide and pay for all the fuel *and MDO* except as otherwise agreed, Port Charges, *canal dues tolls and compulsory* Pilotages, *including Bosporus/Dardanelles, Skaw Danish Straights pilots, Japan inland and Australian hydrographers passage pilotages,* Agencies, Commissions,

40   Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43   charter to be for Charterers account *including any directly related expenses for crew having to be accommodated ashore, if required.* All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44   of six months or more.

45   Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47   for dunnage, they making good any damage thereto.

48  3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49  ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ . . . . . . . . . . . . . . . tons and not more than
50  . . . . . . . . . . . . . . . ~~tons and to be re-delivered with not less than~~ . . . . . . . . . . . . . . . tons and not more than . . . . . . . . . . . . . . . tons. (See clause 31)
51  4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 40,000 per day including overtime every 15 days*
52  *in advance* ~~United States currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53  ~~stores, up . . .~~ ~~Summer freeboard per Calendar Month,~~ commencing on and from the *hour of the day of her delivery,* as aforesaid, and at
54  and after the same rate for any part of a month, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot, safe port Passing Aden Passing Muscat*
56  *Outbound  Colombo range any time day or night, Sundays and Holidays included* unless otherwise mutually agreed Charterers are to give
57  Owners not less than *20 15 10 days approximate and 5 3 2 1 days definite* days
58  notice of vessels expected date of re-delivery, and probable port
59  5. Payment of said hire to be made in *Owners' bank (see clause 32)* New York in cash or United States Currency, semi-monthly *15 days in*
60  advance, and for the last *15 days* half month in
61  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
62  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
63  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
64  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 1 a.m. on the working day~~
65  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
66  ~~to have the privilege of using vessel at once such time used to count as hire~~ *(see clause 32)*
67  6. Cash for vessel's ordinary disbursements at any port may be advanced as required by the *Owners* ~~Captain,~~ by the Charterers or their Agents, subject
68  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
69  of such advances.
70  7. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf *or safe ports or safe* place that Charterers or their
71  Agents may
72  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
73  lie aground.
74  8. That the whole reach of the Vessel's Hold, *no deck cargo* Decks, and usual places of loading (not more than she can reasonably stow and carry), also
75  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
76  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
77  ~~paying Owners . . . . . . . . . . . . per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
78  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

*(continued clause numbering)*

79  9. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
80  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
81  agency, and Charterers are to load, stow, *dunnage, secure, lash, unlash* and trim *and discharge* the cargo at their expense under the supervision of the
82  Captain, who is to sign Bills of Lading for
83  cargo as presented, in conformity with Mate's or Tally Clerk's receipts. *Bills of Lading issued shall contain a Paramount Clause incorporating*
84  *the Hague Rules*
85  10. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
86  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
87  11. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
88  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
89  rate of $10.00 per day Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
90  Clerks, Stevedore's Foreman, etc., Charterers paying *as per Clause 68* at the current rate per meal, for all such victualling.
91  12. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *in English,* and the
92  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
93  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, *extracts in english* showing the course of the vessel
94  and distance run and the con-
95  sumption of fuel *from final loadport (bunkers port, if any) and each distance port as a minimum.*
96  12. That the Captain shall use diligence in caring for the *natural* ventilation of the cargo.
97  ~~13. That the Charterers shall have the option of continuing this charter for a further period of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .~~
     ~~on giving written notice thereof to the Owners or their Agents . . . . . . . . . . . . . . . . . . . . . days previous to the expiration of the first named term, or any declared option.~~
98  14. That if required by Charterers, time not to commence before  *00:01 hours local time, 2nd May 2007* . . . . . . . . . and should vessel
99  not have given written notice of *delivery* readiness on or before  *24:00 hours local time, 12th May 2007* . . . but not later than 1 p.m. Charterers or
100 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's *delivery* readiness.
101 15. That in the event of the loss of time from deficiency of *crew and* or default and/or strikes of master and/or Officers and/or crew
102 men or stores, fire, breakdown or damages to hull, machinery or equipment, *unless caused by Charterers and/or their Agents and/or their*
103 *servants,*
104 grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
105 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
106 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
    thereof and all extra expenses shall be deducted from the hire, *against proper supporting vouchers.*

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
purpose of saving life and property.



107  17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~

108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision, or that of any two of them, shall be final, and for~~

109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men~~   *See Clause 82*

110  18. ~~That the Owners shall have a lien upon all cargoes, and all sub-freights, sub-hires~~ for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel.

114  19. ~~That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and~~

115  ~~Crew's proportion. General Average shall be adjusted, stated and settled~~ *in London,* ~~according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~

116  ~~chapter~~ York-Antwerp Rules *1994* ~~1924, at such port or place in the United States as may be selected by the carrier,~~ and as to matters not provided for by these

117  Rules, according to the laws and usages at the port of *London* ~~New York,~~ ~~in such adjustment disbursements in foreign currencies shall be exchanged into~~

118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120  ~~bond and such additional security as may be required by the carrier must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125  ~~United States money~~ *(See New Jason Clause attached)*

126  In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,

127  whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the

128  goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,

129  losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the

130  goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or

131  ships belonged to strangers. *Hire not to contribute to General Average*

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133  20. Fuel used by the vessel while off hire, also ~~for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~

134  ~~cost of replacing same, to be allowed by Charterers.~~

136  21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

137  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

138  ~~time of last painting and payment of the hire to be suspended until she is again in proper state for the service~~  *No dry-docking except in emergency.* .....................

139

140  22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~

141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~

143  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~

144  ~~Charterers to have the use of any gear on board the vessel.~~ *Vessel to provide electric lights, as on board, for night work, any additional light over those on board to be at Charterers' expenses*

145  23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging~~

146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~

147  ~~deck-hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~

148  ~~port or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers, in the event of a disabled winch or winches, or~~

149  ~~insufficient power to operate winches, Owners to pay for shore engine or engines, in lieu thereof, if required, and pay any loss of time occasioned~~

150  ~~thereby.~~ *Vessel to be loaded and discharged by shore gear at Charterers' expenses.*

151  24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~

152  ~~in the Act of Congress of the United States, approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels~~

153  ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~

154  ~~of which are to be included in all bills of lading issued hereunder:~~

155

156  U. S. A. Clause Paramount

157  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~

158  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~

159  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~

160  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

161  ~~Both-to-Blame Collision Clause~~

162  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~

163  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~

164  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~

165  ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~

166  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~

167  ~~owners as part of their claim against the carrying ship or carrier.~~

168  25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-

169  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

170  port or to get out after having completed loading or discharging. *Vessel is not to be required to force ice or follow ice breakers.*

171  26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the

172  navigation of the vessel, insurance, crew, *acts of pilot and tugboats* and all other matters, same as when trading for their own account

173  27. A commission of *1.25* ~~2 1/2~~ per cent is payable by the Vessel and Owners to Ice Chartering S.A. plus 1.25% to Carriers Chartering

174  Corporation S.A. of Panama .....

175  ~~on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter~~

     28. An address commission of *3.75* ~~2 1/2~~ per cent payable to          *Charterers*          ~~on the hire earned and paid under this Charter~~


ORIGINAL

*Additional Clauses 29-96 all inclusive thereto, are to be fully incorporated in this Charter Party.*



OWNERS                                                    CHARTERERS



This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

ORIGINAL



### Ace Chartering S.A.

### Additional Clauses to M.V. "SD Glory"
### Charter Party dated 25th April 2007

**CLAUSE 29**

Without prejudice to Owners' obligations under Lines 21-25:

Vessel's holds latest on arrival first loading port to be clean/swept/washed down by fresh water and dried, free of loose rust, loose rust flakes/scales and residues of previous cargo(es) and in every way ready and suitable to load intended cargo(es). If the vessel is rejected at loading port by shippers surveyors, vessel to be off-hired from time of rejection until all holds to be accepted by them and all extra expenses directly caused thereby to be borne by owners. Vessel also should be capable on arrival 1st loading port of loading all c/p permissible cargoes. if vessel's holds / tank-tops / cargo areas are rejected other than by reason of the carriage of intermediate cargoes carried by Charterers, then all time, delay, directly related expenses shall be for owners a/c.

**CLAUSE 30**



On hire bunker and/or condition survey to be carried out at first loading port/place of delivery in Charterers' option. Off hire survey to be carried out at last discharge port. Time to be shared equally. And if on hire or off hire survey carried out concurrent with the loading or discharging, then no time will be deducted. For both on hire and off hire surveys an independent surveyor mutually accepted by both parties to be nominated and cost to be shared equally between Owners/Charterers.

**CLAUSE 31**

Bunkers on delivery as on board sufficient to reach Vancouver with safety margin.
Charterers to have the right to bunker the vessel upto her full capacity prior to delivery provided same does not interfere with vessel's operations and owners also to have the right to bunker the vessel prior redelivery provided same does not interfere with Charterers' operations.

Bunkers on redelivery about same as actually on delivery.

Same prices both ends USD 380 pmt IFO and USD 660 pmt MDO.

Charterers to pay value of bunkers on delivery together with 1st hire payment. Charterers have right to deduct value of estimated bunkers on redelivery from last sufficient hire payment(s).



**CLAUSE 32**

Hire to be paid in US Dollars by telegraphic transfer to:

OWNERS: SEA MASTER LEGEND S.A., PANAMA

THE ROYAL BANK OF SCOTLAND PLC
61 AKTI MIAOULI
PIRAEUS - GREECE
SWIFT: RBOSGRAA
CORRESPONDING BANK:
DEUTSCHE BANK TRUST COMPANY AMERICAS
NEW YORK - SWIFT: BKTRUS33

FOR CREDIT OF THE ACCOUNT:

5555-503614-100
IBAN: GR57 0640 0010 0055 5550 3614 100 OF:
SEA MASTER LEGEND S.A.



**Ace Chartering S.A.**

**Additional Clauses to M.V. "SD Glory"**
**Charter Party dated 25th April 2007**

## CLAUSE 32 (Cont...)

Notwithstanding anything contained herein to the contrary, if, at any time during the currency of this charter, hire shall become due on/or during a Saturday, Sunday or a National Holiday, or outside normal office hours, or at any other time which, for reasons beyond their reasonable control, prevents Charterers from effecting payment of hire on the due date, payment of hire may be made on the next banking day immediately following the date on which hire became due.

Hire to be paid every 15 days in advance and the first payment of hire becoming due only after receipt of telegraphic confirmation by Charterers from vessel's Master of the time and date of delivery to Charterers and quantity of bunkers remaining on board. Charterers thereafter will effect payment of hire for the first period plus value of bunkers within two (2) banking working days, then every 15 days. Before commencement of loading Charterers' bank to confirm directly to Owners, Owners' bank the remittance of first hire have been irrevocably effected failing which vessel to remain on hire continuously until money is received in Owners' bank.

## CLAUSE 33

 If, for any reason, Charterers fail to make payment of hire as provided and bunkers on delivery as provided above in Clause 5 (as amended by Clause 32) or commit any other breach of this Charter, Owners shall give notice thereof to Charterers and Owners shall not be entitled to withdraw the vessel unless and until Charterers fail to rectify such breach within three banking working days. However Charterers to do their best to arrange payments in good time.

## CLAUSE 34

The following services from officers and crew are included in hire:
- (a) Opening and closing hatches in connection with loading and discharging.
- (b) Closing and opening of hatches in the event of weather which may adversely affect condition of cargo carried on board during loading and discharging.
- (c) Supervision loading and discharging and everything related thereto
- (d) Deleted
- (e) Shifting vessel during loading and discharging and shifting berth.
- (f) Docking and undocking
- (g) Bunkering

 All expenses other than crew expenses to be for Charterers' account. Provisions of paragraph (a) until (e), both inclusive, are to be subject to same being permitted by local regulations. The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and crew required by the Maritime code of the country under whose flag the vessel sails.

## CLAUSE 35

Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements up to max USD 500 per port of call as well as value of estimated quantity of bunkers on redelivery. Owners will use their own agents at various ports of call.

## CLAUSE 36

Owners warrant vessel has not traded either North of South Vietnam and is not blacklisted by the Arab Authorities.

Unless Owners have prior agreed with Charterers/Charterers' agents to have customary Owners' items paid by Charterers and same deducted from hire, it is understood that if such Owners' items not excessive, then no extra agency fee to be charged.



Ace Chartering S.A.

Additional Clauses to M.V. "SD Glory"
Charter Party dated 25th April 2007

## CLAUSE 37

In the event of the vessel being denied or restricted in use of port, canals and/or loading and /or discharging facilities or shore labour and / or tug and / or pilotage assistance because of vessel's ownership or management or the wages and condition of employment of her officers and/or crew or the officers and/or crew of any other vessel under the same ownership or management because of Owners' previous trading of the vessel or any other vessel as aforesaid but excluding as a result of another vessel under the same management calling at N. Vietnam hire shall cease for the time hereby lost and Owners shall remain responsible for cost incurred by Charterers. Owners further guarantee however that the minimum terms and conditions on which the crew are engaged are now or will be prior to the presentation of the vessel for delivery covered by Agreement acceptable to the ITF. If the vessel does not meet these requirements the vessel is to go off hire until such requirements are fully complied with and any costs involved included labour standing by are to be for Owners' account.

## CLAUSE 38



Any People Republic of China tonnage dues certificate purchased by the Charterers is the property of the Charterers. Subject to Charterers prior permission, Owners/future Charterers of the vessel may be permitted to use such certificate for subsequent employment at a cost of 50 per cent of the original purchase price.

## CLAUSE 39

Charterers to have the right of placing stevedores on deck, entirely at their risk and expense. No fires, cooking or camping permitted on deck.

## CLAUSE 40

If required by Charterers, Charterers/Charterers agents to issue 2nd set BS/L in Hong Kong marked 'clean on board', 'freight prepaid' or 'freight to collect' or 'freight payable as per cp' and marked with different shippers/receivers/notify party than those in the 1st set BS/L against Charterers single L.O.I. in owners P.& I. Club standard wording/format without Bank guarantee and/or bank endorsement. such 2nd set of BS/L to be issued only against Charterers surrender to owners representative in Hong Kong of the first set of BS/L. Procedure for replacement of BS/L as follows:
- Charterers to fax copy of replacement and initial Bills of Lading to owners
- Charterers to prepare L.O.I. as per owners' standard P. & I. wording
- Charterers to present to owners' representative at: (details to be advised at the time):
- the full sets of the initial BS/L
- draft copies of the new BS/L
- original L.O.I.
- only after receiving owns' written authorisation Charterers/Charterers' agents will issue/release the new BS/L to Charterers' orders
- all parties stated in the original BS/L to confirm in writing that they are aware and agree with the requested changes
- all/any expenses/costs incurred fm using Owners' P & I. representative/ agent for above mentioned purposes to be for Charterers' account.

## CLAUSE 41

If required by Charterers, Charterers or Charterers agent to issue Bill of Lading in strict conformity with Mate's receipt.
No trough transhipment or combined transport Bills and no way Bills or Liner Bills to be issued under this Charter Party.



**Ace Chartering S.A.**

**Additional Clauses to M.V. "SD Glory"**
**Charter Party dated 25th April 2007**

### CLAUSE 42

Vessel to have valid deratisation certificates on board at time of delivery and the validity of which to be maintained by Owners in their time and their expense, during the currency of this Charter Party.

### CLAUSE 43

Delivery and redelivery times to be local time but hire to be adjusted to GMT.

### CLAUSE 44

During the currency of this Charter Party, if vessel deviates or puts back whilst on voyage or if there is any loss of time caused by accident, breakdown, accident or sickness to crew (including Master) or any person on board the vessel (other than supercargo travelling under Charterers' auspices) or by reason of the Master or crew being unable to perform their duties provided this hinders normal operation of vessel, hire shall not be paid for the time so lost and the cost of extra directly related fuel consumed and other extra expenses incurred shall be for Owner's account, until vessel is in the same position or at a point equidistant from where deviation took place, and voyage is resumed therefrom.



### CLAUSE 45

Time Charterers to have the benefit of any Return Insurance Premium receivable by Owners from their Underwriters, as and when received from their Underwriters, by reason of vessel being in port for minimum period of 30 days, provided vessel is on hire during same period.

### CLAUSE 46

The vessel's equipment shall at all times be in good working order and comply with the regulations of the countries in which the vessel can be employed under this charter party (including I.L.C. convention number 32, which statutory in the U.S.A., under public law 85-742, part 9 - safety and health regulations for long shoring), and the owners are to ensure that the vessel is at all times in possession of valid and up-to-date certificates of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the master and/or owners to comply with the aforementioned regulations, or because the vessel is not in possession of such valid and up-to-date certificates of efficiency any delay thereto shall be for owners' account and the owners are to pay for all related expenses incurred incidental to and resulting from such failure and hire shall cease from time of failure until the vessel is in a position to comply with the aforementioned regulations. However in this case vessel to be fully on-hire.



### CLAUSE 47

**RED SEA LIBERTY CLAUSE**
Notwithstanding any other provision in this charter party to the contrary including but not limited to any war or blockade risk clauses charterers have the right to order and direct the vessel into Jordanian waters and to proceed to and from any Jordanian port and there to berth, discharge, load and/or operate cargo.
However owners/master's option not to enter Jordanian waters in case the discharge port becomes blockaded or the vessel is prohibited from going to Jordan by vessels war risk underwriters. basic war risk and blocking and trapping insurance and crew war bonus always to be maintained by owners. Charterers agree to indemnify owners for complying with charterers orders pursuant to this clause but limited to the extent of reimbursing owners against only the cost of any additional hull war risks insurance premium, as a direct result of complying with Charterers' orders under this clause, payable by Charterers to owners on the date due for payment by owners to underwriters against presentation of original invoices, always provided that charterers liability under this clause not to exceed the Lloyds quoted war risk rates and all quotes to be calculated on vessel's war risk total insured value of $44 million.
For avoidance of any doubt, this provision to override the incorporated war clause.